■  In the Matter of ARMIL REALTY CORPORATION et al., Respondents, v BOARD OF ESTIMATE OF THE CITY OF NEW YORK et al., Appellants, and BOARD OF STANDARDS AND APPEALS OF THE CITY OF NEW YORK, Respondent.—In a

proceeding pursuant to CPLR article 78, *inter alia,* to review a determination of the Board of Estimate of the City of New York, dated August 18, 1977, which reversed a determination of the Board of Standards and Appeals of the City of New York, dated July 5, 1977, the appeal is from a judgment of the Supreme Court, Queens County, dated March 7, 1978, which, *inter alia,* reinstated the determination of the Board of Standards and Appeals. Judgment affirmed, without costs or disbursements. Petitioners applied for an enlargement of their factory which had previously received a use and area variance in 1962 from the Board of Standards and Appeals (BSA). Under section 11-412 of the Zoning Resolution of the City of New York, the BSA is authorized "in appropriate cases" to grant enlargements of pre-existing variances, which do not exceed 50% of the floor area of such building. Subdivision a of section 668 of the 1976 Charter of the City of New York now grants the Board of Estimate power to review decisions of the BSA in certain instances which concern "applications to vary the building zone resolution." The Board of Estimate contends that an application to enlarge a pre-existing variance is such a reviewable application. We agree. This second enlargement of petitioners' factory constitutes another variation from the zoning resolution. It would seem irrational to hold, as Special Term concluded, that the Board of Estimate is authorized to review the original grant of a variance but not a subsequent modification. Nevertheless, we must affirm the judgment of Special Term which reversed the determination of the Board of Estimate and reinstated the determination of the BSA. The Board of Estimate has a narrow scope of review under section 668 of the 1976 Charter (see *Matter of Cotroneo v Klein,* 62 AD2d 493). It is limited to deciding whether the determination of the BSA is supported by substantial evidence. An enlargement of a pre-existing variance may be granted by the BSA wherever "appropriate", so long as the enlargement does not impair the essential character or the future use of the surrounding area (see Zoning Resolution, § 11-412). This is a far more lenient standard than the business hardship requirement for obtaining the original variance (see Zoning Resolution, § 72-21 *et seq.; Matter of Reed v Board of Stds. & Appeals of City of N. Y.,* 255 NY 126, 131-135). The petitioners in this case demonstrated before the BSA that they needed an enlargement of their floor space to accommodate a modernization of their equipment. Without the modernization, there would be a danger of more than 90 jobs being lost. The enlargement would not touch on any residential property. It would not add any noise pollution to the area since there would be no additional windows or roof openings. Home values have apparently risen in the area despite the presence of the factory and there was no evidence that a 10% increase in the floor area would reverse that trend. The factory owner was required to plant trees to minimize the visual impact of the one-story brick extension. Finally, the proposal was backed by the Economic Development Administration. Based on this record, it was improper for the Board of Estimate to find that the determination of the BSA was not appropriate (Zoning Resolution, § 11-412). Martuscello, J. P., Titone and Shapiro, JJ., concur.

O'Connor, J., dissents and votes to reverse the judgment and dismiss the petition on the merits, with the following memorandum: I am in full accord with the majority insofar as they hold that the Board of Estimate had jurisdiction to review the determination of the Board of Standards and Appeals (BSA) granting an enlargement of a variance. I cannot, however, subscribe to the view that there was substantial evidence before BSA to support its determination. A careful examination of the history of the property in question leads me to conclude that an affirmance of BSA's

determination does violence not only to previous administrative and judicial decisions concerning this property, but also undermines the credibility of BSA itself. The property in question is located within an area which has been zoned as residential since 1961, and which consists primarily of one- and two-family houses. In 1962 petitioners sought a variance to allow an expansion of approximately 150%. After conducting a full hearing BSA granted the application, but set forth conditions to limit the impact of the expansion upon the residential nature of the area and the effect a large commercial operation would have upon an individual's quiet enjoyment of his home. One of the conditions referred directly to the property in issue and directed "that the open triangular area on 58th Road shall be fenced in and landscaped as shown and shall have only a gate for maintenance access and the gate shall be kept locked". It is undisputed that this explicit condition was not complied with, and what was meant to serve as an effective buffer zone between the factory and the homes on 58th Road is today a vacant lot overgrown with weeds, filled with refuse and tin cans and is an eyesore to the entire neighborhood. In March, 1976 petitioners sought, pursuant to section 11-412 of the Zoning Resolution of the City of New York, an expansion of their factory onto this buffer zone. By resolution adopted on June 22, 1976 BSA denied the application and by judgment dated January 5, 1977 Special Term upheld BSA's determination, stating: "The record upon which the denial was based exhibits numerous complaints from residents in the area as to the amount of smoke and noise emanating from the mill as presently situated and their apprehensions and reservations as to increases in those conditions upon the construction of the proposed extension. In addition, the residents express the fear that trucks would use the 58th Road frontage to service the factory and this would pose further danger to their restricted residential district. *Although, as contended by petitioners, the Board could have granted the application imposing conditions to prevent any adverse effects, the record is clear that petitioners had previously failed to comply with conditions provided for in the 1962 determination.*" (Emphasis supplied.) On February 8, 1977, a scant one month later, petitioners reapplied to BSA for the proposed extension and in support of the application new structural plans for the extension were submitted. The new plans were focused on minimizing the problems of noise and air pollution, traffic congestion, and the general deterioration of a residential area that would result from the extension. Petitioners also emphasized that a rejection of their application would result in severe financial hardship to them in terms of their ability to compete with other manufacturers of their product. They alleged, in substance, that they would be forced out of business if their application was not granted. Despite its previous rejection, a very short time before, of an almost identical proposal and, in the face of strong opposition from the local community planning board and area residents, BSA reversed itself and granted the enlargement subject to conditions similar to those imposed in 1962. On appeal, the Board of Estimate reversed the most recent BSA determination, finding that there was no substantial evidence to support it. The Board of Estimate noted, *inter alia,* that by its latest decision BSA was ignoring its 1962 conclusion that the property in question was needed to serve as a buffer between the factory and the residences across the street from it, and that "The applicant has demonstrated a predilication [sic] towards not complying with conditions imposed upon variances granted to it." I am in full accord with the Board of Estimate's determination that there was no substantial evidence before BSA to support its conclusion that this was an "appropriate" case for granting a

variance enlargement. There is no explanation at all in this record as to why an area specifically set aside as a buffer zone in 1962 to protect the residential nature of the area is no longer necessary to serve this function. The residents of 58th Road will now be exiting their homes each morning to the sight of a pollution generating factory. In his application for this enlargement, Milton Goldman, petitioners' officer, has pledged that no further westward expansion of the factory will be sought. Of what value is this pledge if the 1962 buffer zone condition is not cast aside without any substantial reason? Should the factory now be permitted to digest in small pieces that which it was forbidden to swallow in a single, voracious bite, and is not such permission opening the door to a slow, subtle erosion of the character of the entire area? Why are petitioners, who have a prediliction towards totally ignoring previously imposed conditions, suddenly accepted as trustworthy to comply with new ones? These questions remain unanswered because the record created by BSA simply fails to supply satisfactory answers. The sudden reversal of form by BSA here is also quite troubling. In June, 1976 BSA determined that this was not an appropriate case for granting an enlargement and Special Term, in affirming, noted that BSA could have granted the application and imposed conditions, but it failed to do so. Under these circumstances, I fail to see how the new application, submitted less than eight months after the first application was rejected, presented any new evidence. Whatever alterations in the building plans that were created for submission of the February, 1977 reapplication could have been imposed by BSA as conditions to granting the 1976 application. For this reason the rapid and complete reversal of BSA's stance raises questions about the reliability and consistency of positions which BSA has taken. Furthermore, I believe the method of application for this enlargement raises serious questions. Should a petitioner be permitted to put forth building plans which maximize the negative effects to be felt by the surrounding community, and then be afforded, after rejection, a second chance by submitting a new plan which minimizes the negative impact to be felt? Must residents who oppose expansion of an existing commercial variance be put to an annual test of whether they can successfully oppose a new, slightly varied application? I think not. Nor is there any substantial evidence in the record to justify the confusing and contradictory change of position taken by BSA. It is noted that the record contains evidence that a failure to expand the factory will hurt petitioners' competitiveness in the market. There is nothing in the record, however, to refute the claims made that there were alternative locations nearby for the location of the new machinery. Nor is there anything in the record to indicate that economic conditions changed so dramatically between 1976 and 1977 as to justify this piecemeal approach to variance enlargement applications. For the foregoing reasons, I respectfully dissent.